UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SAMUEL BEAN-EL, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:08 CV 1122 DJS |
| ) | DDN |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Samuel Bean-El, Jr., for disability insurance benefits and supplemental security income under Titles II and XVI, of the Social Security Act (the Act), 42 U.S.C. §§ 401, et. seq., 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be reversed and remanded.

**I. BACKGROUND**

On September 25, 2006, Bean-El filed an application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act alleging a disability onset date of September 1, 2006. (Tr. 126, 131.) The claim was denied on initial review. (Tr. 31, 104.)

Bean-El requested a hearing, appealing directly to the ALJ.[1] On February 18, 2008, following a hearing, the Administrative Law Judge (ALJ) found that Bean-El was not disabled. (Tr. 28-42.) On May 29,

---

[1]Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. 20 C.F.R. §§ 404.906, 404.966, 416.1406, 416.1466 (2007). These modifications include, among other things, the elimination of the reconsideration step. See id.

2008, the Appeals Council denied his request for review. (Tr. 1-3.) Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND ACADEMIC HISTORY

Bean-El was born on October 29, 1959. On November 3, 1969, when Bean-El was 10 years old, he was administered the Stanford-Binet Intelligence Test by the Special Education Department of the St. Louis Public School District and obtained a score of 72. (Tr. 232.)

On October 31, 1972, records from the St. Louis Public School District indicate that Bean-El, then 13 years old, was administered the Wechsler Intelligence Scale for Children (WISC), and obtained scores of Verbal 60, Performance 50, and Full Scale 51. (Tr. 230.)

On June 4, 2002, consultative examiner L. Lynn Mades, Ph.D., administered the Wechsler Adult Intelligence Scale – Third Edition (WAIS-III). (Tr. 224-28.) Bean-El obtained IQ scores of Verbal 66, Performance 68, and Full Scale 64. (Tr. 227). Dr. Mades observed that Bean-El's overall effort and cooperation appeared to be good, and stated that the results were considered to be a valid estimate of his overall level of cognitive functioning. (Id.) Dr. Mades also noted that the results were consistent with his testing results while in school. (Tr. 228.)

From November 3, 2005, through April 11, 2007, Bean-El received health care through Grace Hill Neighborhood Health Care at St. Patrick's Center. (Tr. 233-43, 267-83.) On November 15, 2006, many excoriated[2] hyperpigmented papules[3] over Plaintiff's extremities were noted. (Tr. 274.) On December 6, 2006, excoriated papules were again noted, and an assessment of prurigo nodularis[4] was given. (Tr. 273.)

---

[2]Scratched or otherwise stripped off the skin by physical means. Stedman's Medical Dictionary 681 (28th ed. 2006).

[3]A circumscribed, solid elevation up to 1 cm. in diameter on the skin. Id. at 1416.

[4]An eruption of hard, dome shaped nodules in the skin cause by rubbing and accompanied by intense itching; occasionally due to
(continued...)

On April 4, 2007, Bean-El was seen by nurse-practitioner Judith Gallagher, who noted that Bean-El was receiving Hepatitis C treatment and also noted the presence of extreme hyperpigmented papules over his entire body as well as pruritic[5] rash. (Tr. 268-69, 277.) Her assessment included hepatitis C and prurigo nodularis. (Tr. 270.)

From December 8, 2005, through July 20, 2007, Bean-El also received health care through ConnectCare for, among other things, his skin condition and his hepatitis C. (Tr. 244-61, 284-317.) On December 8, 2005, he was seen in the Dermatology Clinic at which time he reported improvement with his skin and requested refills for his prescriptions. (Tr. 258.) Examination revealed hyperpigmented macules on the arms, chest, and trunk, with excoriations noted. (Id.) The assessment was prurigo nodularis and pruritis. (Id.)

On April 24, 2006, Bean-El was seen at ConnectCare by Dr. Hudda Hantush for muscle spasm on his neck and was prescribed Flexaril, a muscle relaxant. (Tr. 251-54.) On June 24, 2006, he was seen in Urgent Care by Dr. Balle Vittal Varanasi. (Tr. 245-50.) He noted Bean-El's history of hepatitis and "intense pruritis" had not responded to antibiotics, steroids, or creams. (Tr. 245.) Dr. Varanasi's notes indicate moderate persistent itching and "skin lesion(s): EXCORIATIONS DUE TO ITCHING." (Tr. 246.) Dr. Varanasi also found that Bean-El's color and pigmentation were abnormal and there were "OLD SCARS FROM ITCHING AND EXCORIATIONS EXTENSIVE ALL OVER THE BODY." (Tr. 247.) Dr. Varanasi's assessment included Hepatitis C and pruritis. (Tr. 248.) He prescribed Amoxicillin and Cyproheptadine, both antibiotics, and suggested referral to the Infectious Disease Clinic. (Id.)

On July 20, 2006, Bean-El was seen in the Dermatology Clinic at ConnectCare for an itchy rash all over his body. (Tr. 255.) He reported improvement on his trunk but that the lesions on his leg were still bothersome. (Id.) Examination revealed hyperpigmented papules on lower extremities, trunk, and buttocks, with central excoriations,

---

[4](...continued)
mycobacteria infection, the cause is generally unknown. Id. at 1587.

[5]Itching. Id. at 1587.

-3-

depigmented narrow macules[6] along the shins, and hyperpigmented scars along the trunk and arms. (Id.) Assessment included prurigo nodularis with pruritis,[7] improved on trunk but still bothersome on his legs. (Id.) He was prescribed Doxepin, an antibiotic, and Clobetasol. (Id.)

On October 13, 2006, Bean-El was seen by Michael Spezia, D.O., who reported that Bean-El complained of itching all over, with an onset three and one half years earlier. (Tr. 263.)

On November 30, 2006, Bean-El was seen in the Dermatology Clinic at ConnectCare for severe itching with a rash all over his body. (Tr. 308.) Bean-El reported that his rash was not improving, that he had run out of medications two months earlier, and that he had been using an ointment he obtained from St. Patrick's Center. (Id.) The examiner noted hyperpigmented macular/papular lesions on legs, arms, abdomen, and back, as well as hyperpigmented post-inflammatory macules. (Id.) Some perifollicular[8] erythematous papules on the abdomen were noted and his shins showed areas of hypopigmentation and excoriation. (Id.) Assessment was prurigo nodularis, possibly secondary to folliculitis.[9] (Id.)

On January 11, 2007, Bean-El was seen at ConnectCare complaining of intense itching all over his body. (Tr. 306.) He reported that he was still taking the antibiotic Doxycycline and the anti-depressant Doxepin, as well as using the Clobetasol ointment, but that the Clobetasol was helping "very little" with the itching. (Id.) He reported that he was unable to work as a cook because of his itching and rash and was applying for disability. (Id.) The examiner noted hyperpigmented macular/papular lesions on his arms, back, chest, legs, and abdomen, with most appearing macular post-inflammatory hyperpigmentation. (Id.) Hypopigmented patches on the shins were also

---

[6]A circumscribed flat area, up to 1 cm in diameter, differing perceptibly in color from the surrounding tissue. Id. at 1142.

[7]Itching. Id. at 1587.

[8]Surrounding a hair follicle. Id. at 1458.

[9]Inflammation of a hair follicle. Id. at 754.

-4-

noted. (Id.) Remeron, an anti-depressant, was prescribed for his itching. (Id.)

On March 8, 2007, Bean-El was seen again at ConnectCare. He could not remember the medications he was taking. (Tr. 303-304.) Hyperpigmented papules were noted on his chest, back, abdomen, and lower extremities (larger on the lower extremities). The assessment was prurigo nodularis. The examiner recommending treatment for his Hepatitis C and questioned his compliance with his medication. (Id.)

On April 20, 2007, Bean-El was seen at the Gastrointestinal (GI) Clinic for hepatitis C follow-up. A pruritic rash was noted over his entire body, and lab testing was ordered. (Tr. 298-300.)

On May 7, 2007, ConnectCare physicians requested authorization for a CT-guided liver biopsy for his hepatitis. (Tr. 301, 310-11). On June 4, 2007, Bean-El went to the GI Clinic for hepatitis C and was enrolled in the pharmacy assistance program. (Tr. 291.) On June 21, 2007, he attended Hepatitis C instruction there. (Tr. 289.)

On July 20, 2007, he was seen again in the GI Clinic for his Hepatitis. (Tr. 287-288.) Bean-El reported he had taken one injection of Pegasys, a prescription medicine for treatment of Hepatitis C, but stopped because the side effects were "too much." (Tr. 287.)

In a Disability Report – Adult form, Bean-El stated that the conditions limiting his ability to work included headaches from injury and dizziness, skin problems, and Hepatitis C. (Tr. 165.) He reported difficulty remembering things, and that dizziness sometimes required him to sit. (Id.) He reported that his previous full and part-time jobs included clean-up person, dishwasher, factory worker, laborer, and short-order cook. (Tr. 166.) He reported that his longest-held job was from 1992 though 2005 as a short-order cook. (Id.) He stated that in that job he lifted 50 pounds occasionally and 25 pounds frequently, and was walking or standing the entire workday. (Tr. 166-67, 177-78.) He added that he finished the 12th grade, but was in a class for slow learners. (Tr. 170.)

In a Work History Report form, Bean-El again reported previous jobs as a clean-up person, dishwasher, laborer, and short-order cook. (Tr. 172.) The form indicates that all of the jobs except short-order cook

were relatively short-term.  He worked as a dishwasher and factory worker in 1991; as a clean up person for a few days in March 2004; and as a laborer in March 2003.  (Id.)

In a Function Report – Adult form dated October 6, 2006 completed by Bean-El, Bean-El described his daily activities.  (Tr. 184-91).  He reported that since his illness, he could no longer cook on the grill or help in the kitchen, such as washing dishes.  (Tr. 185.)  He reported sometimes he could not sleep at all.  (Id.)  He said that he sometimes forgot to do important things, such as go to doctor's appointments.  (Tr. 186, 188.)  He reported that his head hurt badly all the time; that he had a plate in his head; that his condition affected his hearing and getting along with others; and that he sometimes heard "things like somebody calling my name, some time I hear people talking."  (Tr. 186-89.)

In another Work History Report form dated October 9, 2006 completed by Bean El, he reported that his jobs include grill cooking/deep fry cooking, pre-cook/line cook for a temporary service, "working on the boat" for another temporary service, and maintenance worker.  (Tr. 192.)

In a Disability Report – Appeal form completed by Bean-El, when asked whether there had been any changes in his condition since he last completed a disability report, Bean-El reported that his condition was the same.  (Tr. 211.)  When answering whether he had any new physical or mental limitations since he last completed a disability report, he answered, "Yes I do have a physical mental problems.  I have a plate in my head."  (Id.)  When answering whether he had any new illnesses or conditions since he last completed a disability report, he responded that he was having problems dealing with society.  (Tr.  212.)

**Testimony at the Hearing**

Bean-El testified at the hearing held on January 22, 2008.  (Tr. 43-65.)  At that time he was 48 years old and lived with his girlfriend.  (Tr. 47-48.)   He had past relevant work (PRW) as a grill cook and janitor.  (Tr. 49, 62-63.)

Bean-El testified that he could not work because he had a skin disease that caused irritation and itching, kept him from resting or

sleeping well at night, and caused him to scratch himself during his sleep sometimes, to the point of bleeding. (Tr. 50-51, 56-57.) Bean-El also testified that he had dizzy spells two or three times a week, and headaches four or five times a week, some of which lasted for two or three days. He testified that he had a plate in his head as a result of a head injury when he was 18 months old. (Tr. 51-52.)

He testified that standing for four or five hours caused him to feel dizzy, and that he could sit for three or four hours. (Tr. 53.) He testified that he thought he might be able to carry 150 pounds, but not frequently, and that the most he ever actually lifted was 75 to 80 pounds. (Tr. 54.)

### **III. DECISION OF THE ALJ**

On February 12, 2008, the ALJ issued an unfavorable decision. At Step One of the decision process, the ALJ determined that Bean-El had not engaged in substantial gainful activity at any relevant time. (Tr. 33.) The ALJ found that Bean-El also had a history of Hepatitis and "chronic dermatitis," but that those did not impose significant work-related limitations. (Id.)

At Step Three, the ALJ determined that Bean-El had a severe impairment of mild mental retardation. (Tr. 33.) The ALJ then stated the requirements of Listing 12.05C and determined that he did not have additional impairments that resulted in significant work-related limitations. (Tr. 33-34.) The ALJ found that Bean-El did not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of Listing 12.05C. (Id.)

At Step Four, the ALJ determined that Bean-El had the residual functional capacity (RFC) to perform the exertional requirements of work at all exertional levels, but that due to his mild mental retardation he would be limited to work requiring no more than simple oral instructions and the ability to meet those instructions. (Tr. 35.) The ALJ found that Bean-El was capable of performing his past relevant work (PRW) as a short order cook, clean up person, dishwasher, and factory

worker.  (Tr. 38.)  The ALJ therefore concluded that Bean-El was not disabled.

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, No. 07-3561, 2009 WL 1212805, at *6 (8th Cir. May 6, 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 2009 WL 1212805, at *6.  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 2009 WL 1212805, at *6 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  Pate-Fires, 2009 WL 1212805, at *6.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform

his past relevant work. (Id.) The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

## V. DISCUSSION

Bean-El argues the ALJ erred in (1) failing to find that he met the requirements of Listing 12.05C; and (2) failing to call a medical expert or send him to a consultative examination; and (3) failing to make a finding that is supported by substantial evidence because he apparently thought he was considering an assessment by a State agency medical consultant when there was no such assessment in the record.

### A. Listing 12.05C

Bean-El argues the ALJ erred in failing to find that he met the requirements of Listing 12.05C. Listing 12.05C is the listing for mental retardation. 20 C.F.R., Part 404, Subpart P, App. 1. To meet or equal Listing 12.05C, and give rise to a conclusive presumption of disability, a claimant must satisfy three elements: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment that imposed an additional and significant work-related limitation of function, i.e., a "more than slight or minimal" effect on the ability to perform work. See 20 C.F.R., Part 404, Subpart P, Appendix 1; Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). Bean-El bears the burden of establishing that he meets the listing. See Gonzalez v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006).

Bean-El argues his skin condition satisfies the third prong of Listing 12.05C because his itching interferes with his ability to concentrate, preventing him from performing a cooking job. He suggests that the conditions described in his medical history would necessarily impose additional and significant work-related limitations of function beyond the limitations already inherent in his age, work experience, education, and low IQ. He argues that suffering from constant intense

itching is likely to interfere with his ability to maintain concentration, and that a person who suffers from recurrent severe itching is unlikely to be able to hold jobs involving food preparation, the area of his PRW. The Commissioner concedes that Bean-El meets the IQ portion of the test, but contends that he fails to provide specific medical findings to show that his skin impairment would cause significant work-related limitations. The undersigned disagrees.

In Bean-El's case, there was substantial evidence that he has a consistent and extensive history of a chronic skin condition and rashes which cause intense itching at times. His diagnoses include prurigo nodularis and prurutis. His condition has responded inconsistently to antibiotics and topical steroids. At the hearing, Bean-El testified that he continued to suffer from skin sores, itching and skin problems, as well as dizziness and headaches, and that his itching and scratching sometimes leads to bleeding.

The court notes that the ALJ stated in his opinion that, "[w]hile the claimant has had some abnormal skin color and pigmentation, this does not impose any limitations. He has also had some skin lesions resulting from chronic dermatitis, but these lesions have not caused any significant work-related limitations." (Tr. 34-35.) The ALJ does not refer to Bean-El's itching, which was documented in the records provided by the two health care providers, Grace Hill and ConnectCare, and which was not contradicted by any evidence.

Therefore, the final decision of the Commissioner must be reversed and the action remanded for the ALJ to reconsider the record and to make specific findings relating Bean-El's skin condition and the intense itching to his RFC.

**B.     Medical expert and/or consultative examination**

Bean-El next argues the ALJ erred in failing to call a medical expert or send him to a consultative examination because the record contains no evidence of an assessment by a physician or his work-related limitations stemming from his physical condition. The court agrees.

The ALJ should have called a medical expert to testify about Bean-El's work-related limitations that could be expected to result, or sent

him to a physical consultative examination for an assessment of such limitations.  See Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002) (court may remand for taking of further evidence where ALJ fails to develop record fully); Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001) (reversible error for ALJ not to order consultative examination where such evaluation is necessary to make informed decision).

**C.   Substantial Evidence**

Bean-El contends the decision is not supported by substantial evidence because the ALJ mistakenly believed he was considering an assessment by a State agency medical consultant when there was no such assessment in the record, nor did he explain the weight given to whatever he was considering.  The ALJ stated, "The findings and opinions of the claimant's treating and examining sources are well supported, and entitled to substantial weight.  However, in reaching a conclusion regarding whether the claimant is disabled, the undersigned has also considered the assessment of the State agency.  (SSR 96-6p)"  (Tr. 38.)

Bean-El cites three problems with the ALJ's statement.  First, the ALJ does not identify the assessment to which he refers.  He notes that the record contains no Physical Functional Capacity Assessment of any kind, and at the time of the ALJ's decision, the record did not contain a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique form.  He contends it is therefore impossible to know what the ALJ was referring to when he referred to the "assessment of the State agency."

Second, he contends that SSR 96-6p, the Social Security Ruling cited by the ALJ, applies to an ALJ's consideration of findings of fact by State agency medical and psychological consultants and other program physicians and psychologists.  Thus, whatever assessment the ALJ was considering, he apparently thought that it was an assessment by a State agency medical or psychological consultant, and as previously stated, there was no such assessment in the record.

Third, he contends the ALJ did not explain what weight he gave whatever assessment he was considering.  He argues that regardless of the source, the ALJ must explain the weight given to it.

The Commissioner argues that an ALJ is not required to specifically outline very piece of evidence submitted, and even assuming arguendo that the ALJ erroneously referred to a state agency report which did not exist, any error is harmless because the evidence on the record as a whole supports the ALJ's decision. The undersigned disagrees.

Because the ALJ's consideration of a non-existent State agency's assessment cannot be evaluated or reviewed, remand is warranted for proper analysis. Cf. Dewey v. Astrue, 509 F.3d 447, 448 (8th Cir. 2007) (reversing and remanding adverse disability determination where the ALJ mistakenly relied on lay source's RFC assessment as medical testimony; court could not say ALJ would inevitably have reached the same result if he had understood the RFC assessment had not been completed by a medical source).

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g). The ALJ should (1) call a medical expert to testify about Bean-El's work-related limitations that could be expected to result, or send him to a physical consultative examination for an assessment of such limitations; and (2) reconsider the record, to make specific findings as to Bean-El's work related limitations stemming from his physical condition.

The parties are advised that they have ten days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

                                                /S/   David D. Noce
                                        **UNITED STATES MAGISTRATE JUDGE**

Signed on July 16, 2009.